## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

SCOTT DRAPER, an individual;                      )
RUSSELL FORD; an individual;                      )
RYAN FROST, an individual;                        )
STEFANI FROST, TRUSTEE OF THE                     )
STEFANI CLEMMENSEN FROST LIVING                   )
TRUST DATED MAY 12, 2011,                         )
                                                  )
Plaintiffs,                                       )
                                                  )           Civil Action No.
v.                                                )
                                                  )           **JURY TRIAL DEMANDED**
JUSTIN BROWN, an individual;                      )
ADAM HORTON, an individual;                       )
JEREMY BENNETT, an individual;                    )
JAMES M. YOHANAN, an individual;                  )
DELTA PLAINS SERVICES LLC, an                     )
Oklahoma limited liability company;               )
ENERGY FINANCING AND INVESTMENTS                  )
LLC, a Colorado limited liability company.        )
                                                  )
Defendants.                                       )

---

## COMPLAINT

---

Plaintiffs, Scott Draper, Russell Ford, Ryan Frost, and Stefani Frost, Trustee of the Stefani

Clemmensen Frost Living Trust dated May 12, 2011 (the "Trust"), state as follows for their

Complaint:

## NATURE OF THE ACTION

1.      This securities fraud actions arises from a fraudulent scheme perpetrated by Justin

Brown and his sham company, Delta Plains Services LLC, and his associates, Adam Horton and

Jeremy Bennett, to induce Plaintiffs to invest over a million dollars in a fake oil well servicing

company.

2.      This action also includes James Yohanan, and his company, Energy Financing and Investments LLC, through which Plaintiffs made much of their investment into Delta Plains Services LLC.  James Yohanan made negligent misrepresentations concerning the trustworthiness of Justin Brown, and the business performance of Delta Plains Services LLC.

## PARTIES

3.      Plaintiff Scott Draper ("Draper") is a citizen of the State of Colorado.

4.      Plaintiff Russell Ford ("Ford") is a citizen of the State of Colorado.

5.      Plaintiff Ryan Frost ("Frost") is a citizen of the State of Colorado.

6.      Plaintiff Stefani Frost ("Trustee") is the duly acting Trustee of the Trust and sues in her capacity as such.  Trustee is a citizen of the State of Colorado.  Frost is Trustee's spouse, and a representative of the Trust.

7.      Defendant Justin A. Brown ("Brown") is a citizen of the State of Texas.

8.      Defendant Adam Horton ("Horton") is a citizen of the State of Texas.

9.      Defendant Jeremy Bennett ("Bennett") is a citizen of the State of Texas.

10.     Defendant James M. Yohanan ("Yohanan") is a citizen of the State of Colorado.

11.     Defendant Delta Plains Services LLC ("Delta Plains") is a citizen of the State of Oklahoma and is registered to do business in Texas

12.      At all times relevant to this Complaint, Brown, Horton and Bennet acted as agents of or on behalf of Delta Plains.

13.     Defendant Energy Financing and Investments LLC ("EFI") is a citizen of the State of Colorado.

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over Defendants Brown, Horton, Bennett, Yohanan, Delta Plains, and EFI because: (a) Defendants are subject to nationwide service and have

2

sufficient contacts with the United States; and (b) Defendants purposefully directed their activities at residents of Colorado and this litigation results from injuries that arise out of or relate to those activities.

15.     This Court has subject matter jurisdiction over Counts I, II, and III below pursuant to 28 U.S.C. § 1331 and § 27 of the Securities Exchange Act of 1934 (the "Act"), (15 U.S.C. § 78aa), because such counts arise under the Act.

16.     Pursuant to 28 U.S.C. § 1367(a), this Court has subject matter jurisdiction over Counts IV through XIII below, because the claims asserted therein are so related to the claims in Counts I, II, and III that they form part of the same case or controversy under Article III of the United States Constitution.

17.     Venue is proper in this District pursuant to § 27 of the Act and 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## COMMON FACTS

### The Fraudulent Scheme

18.     Defendants Brown, Horton, Bennett, and Delta Plains (collectively, the "Delta Defendants") operate a fraudulent scheme wherein they induce persons to enter investment contracts whereby their victims advance hundreds of thousands of dollars for either (1) purported equipment purchases to service oil wells, or (2) purported "working interests" in oil wells and leases.  The Delta Defendants represent that these investments will provide significant and stable monthly income, and a repayment of the principle investment, with interest, within a short period.

19.     In fact, the Delta Defendants have no intention to repay the hundreds of thousands of dollars received or provide any monthly income.  The investments are a scam.

20.     Moreover, when the repayments are not made, the Delta Defendants engage in further deception to ease the investors' concerns and convince the parties to provide further investment with the promise of even greater returns.

### The Fraudulent Structure

21.     In or around late summer or early fall of 2018, Defendant Yohanan introduced Plaintiffs to Defendant Brown.

22.     After organizing EFI on or around August 8, 2018, Yohanan, known to Plaintiffs as the "managing director" of EF, worked to subscribe investors in EFI for purposes of investing collected money with one or more of the Delta Defendants.

23.     Yohanan represented to Plaintiffs that Brown and/or the Delta Defendants were trustworthy and reliable in repaying investments.   Considering the amounts solicited for investment, the assumption of securities offering duties, and the lack of reasonable confirmations regarding the legitimacy of the investments he was promoting, Yohannan made these representations with reckless disregard for the truth, as knowing violation of law, or with gross negligence.

24.     To shore up those representations, Yohannan told Plaintiff Ford in late summer or early fall of 2018 that Yohanan's previous investments with one or more of the Delta Defendants were successful, except one venture, but that the unsuccessful investment was made good "in the back end" by one or more of the Delta Defendants.

25.     Relying on Yohanan's representations, Plaintiffs held several telephone conferences with Brown during this time frame.

26.     In these conversations, Brown solicited investments from Plaintiffs, and represented that his company earned significant profits servicing oil and gas wells.

4

27.     Brown represented to Plaintiffs that his company, Delta Plains, had agreements in place with oil companies to rent oil production equipment, such as sand separators, valves, trucks, and tanks, at significant daily profits.

28.     Following one such telephone conversation, on September 26, 2018, Defendant Bennett sent an email to Plaintiffs representing the daily rental schedule under an agreement with Triumph Energy, a petroleum wholesaler:

Fellas here are the day rates for triumph energy.

Per day
$275 dbl buster tank
$125 ½ pit or dump pit
$450 5k sand separator
$550 10k sand separator
$650 15k sand separator
$450 test unit
$150 flare stack
$150 5 valve manifold
$200 10 valve manifold
$100 4 way gate manifold 2"
$450 dbl barrel plug catcher
$50 isolation valves 3"
$750 cyclonic sand separator
$25 plug valves 2 x 2
$6 Kevlar restraints
$3 per foot flow iron 3"
$12 flange
$912 Flowhand
$36.50 per hour/per rig up hand
$2.50 pickup per mile round trip
$4.00 winch truck/pole truck per mile round trip

Gentlemen these are the basic prices.
Any questions or concerns please feel free to ask.

Best regards,
Jeremy Bennett
Delta Plains
(405)818-0885

29.     Bennett further provided Plaintiffs a schedule of equipment daily rentals, on Delta Plains letterhead, representing profits of $112,260.00 per month at "1 location in the stack & scoop."

30.     Brown and Bennett also provided Plaintiffs with a PowerPoint slide deck entitled "Asset Inventory," purportedly used to market Delta Plains' equipment to oil producers.  This slide deck described and contained pictures of trucks and equipment purportedly belonging to Delta Plains.

31.     Brown and Bennett represented to Plaintiffs that Delta Plains needed investment capital to purchase equipment, and, with daily rental agreements already in place, Delta Plains could earn a significant profit for Plaintiffs.

32.     Upon information and belief, none of these representations by Brown and Bennett were true, and Brown and Bennett knew they were not true.

33.     Upon information and belief, Delta Plains did not own any equipment at all, or have any contracts or agreements in place to service oil wells or earn revenue.

34.     Delta Plains knew that its equipment and services were not generating profits at the levels they represented to Plaintiffs over a period of many months and years.

35.     Because of representations made by Defendant Yohanan and one or more of the Delta Defendants, Plaintiffs  invested in Delta Plains as alleged members of a company owned and managed by Yohanan, EFI.

36.     Yohannan produced an EFI operating agreement, but Plaintiffs never signed the operating agreement.

37.     Relying on Brown's and Bennett's assurances regarding Delta Plains' profitability, and Yohanan's assurances of Brown's trustworthiness, Plaintiffs made significant investments in EFI, for the purpose of investing in Delta Plains.

38.     EFI, Yohannan and one or more of the Delta Defendants conspired to defraud Plaintiffs and other investors. For example, Justin Brown signed documents on behalf of EFI, including documents falsely promising EFI investors that investments would be repaid within interest.

<u>Investment by the Trust</u>

39.     On or about October 10, 2018, the Trust invested $250,000 into EFI, purchasing 2.5 units of EFI, through a subscription agreement ("the Trust Subscription Agreement"). EFI, in turn, was to invest the proceeds of $250,000 into Delta Plains for purchase of equipment to be leased to oil producers, as represented by Brown and Bennett.

40.     Under section 4.1 of the Trust Subscription Agreement, entitled "Payback Schedule," EFI was to pay the Trust quarterly payments of $32,083 for 11 quarters, with a final payment of $32,087 in quarter 12, for a total payback of $385,000.

41.     EFI failed to pay back any of the funds invested by the Trust.

<u>Investment by Draper</u>

42.     On or about October 16, 2018, Draper invested $200,000 into EFI, purchasing two units of EFI, through a subscription agreement ("the Draper Subscription Agreement"). EFI, in turn, was to invest that $200,000 into Delta Plains for purchase of equipment to be leased to oil producers, as represented by Brown and Bennett.

43.     Under section 4.1 of the Draper Subscription Agreement, entitled "Payback Schedule," EFI was to Pay the Draper quarterly payments of $25,666 for 11 quarters, with a final payment of $25,674 in quarter 12, for a total payback to Draper of $308,000.

44.     EFI failed to pay back any of the funds invested by Draper.

Investment by Ford

45.     On or about October 15, 2018, Ford invested $475,000 into EFI, purchasing 4.75 units of EFI, through a subscription agreement ("the Ford Subscription Agreement") (all purchased units of EFI are collectively hereinafter referred to as "EFI Units," and the Trust Subscription Agreement, the Draper Subscription Agreement and the Ford Subscription Agreement are hereinafter collectively referred to as "the Subscription Agreements."). EFI, in turn, was to invest the $475,000 transferred by Ford to EFI into Delta Plains for purchase of equipment to be leased to oil producers, as represented by Brown and Bennett.

46.     Under section 4.1 of the Ford Subscription Agreement, entitled "Payback Schedule," EFI was to pay Ford quarterly payments of $60,958 for 11 quarters, with a final payment of $60,962 in quarter 12, for a total payback to Ford of $731,500.

47.     EFI made only a single payment of $60,958 on or about February 2, 2019. EFI has failed to pay back any other funds invested by Ford.

**The Fraudulent Scheme Compounds**

48.     On or about July 19, 2019, Yohanan sent an email to Draper, Frost, and Ford, to reassure Plaintiffs that Delta Plains was doing well, despite the missing repayments. Yohanan represented that he spoke with Brown and Horton "on a weekly basis if not more." Yohanan represented "I believe it is all going well for them." Yohanan represented that Plaintiffs' investments in Delta Plains, through EFI, "went to purchase equipment. There is literally a list of 815 items and equipment that were purchased from the buy-out of the assets of another company." Upon information and belief, these representations were not true.

49.     In his July 19, 2019, email, Yohanan "attached an updated executive summary or [sic] the business . . . which is a good outline of what they have done and where they are at, and

8

where they are headed." This "executive summary" contains the name and contact information of Horton, on Delta Plains letterhead. The executive summary represents, *inter alia*: "Delta Plains profit margins are running approximately 33-35%, depending on the type of services we are providing, and Delta has service agreements in place to continue expansion as these two plays continue their rapid growth."

50.     The executive summary, provided by Yohanan as a "good outline" of Delta Plains' business performance and future, further represents: "As we continue to acquire additional equipment, we are in place to add 10 major accounts invoicing approx.. $500,000/month each, and another 5 major accounts invoicing approx.. $300,000/month each, combining for $6.5 Million in revenue per month."

51.     Contrary to Yohanan's representation, the executive summary was not a "good outline" of Delta Plains' business performance, as represented by Yohanan. Upon information and belief, it turned out to be a lie to prop up and continue the scam.

52.     Serial misrepresentations and inducements by one or more of the Delta Defendants, particularly by Brown, continued. For example, Brown repeatedly represented to Ford that the Covid-19 pandemic interrupted business operations, but that business success sufficient to repay Plaintiffs was imminent, if additional equipment, such as sand separators, could be purchased with additional investment funds from Plaintiffs.

53.     Based upon Yohanan's assurances about Delta Plains' business performance, as well as multiple verbal assurances from Brown that Delta Plains had leasing contracts and good business prospects, and Brown's representation that more funding was needed to generate profits sufficient to pay Plaintiffs, Ford and Frost agreed to invest additional funds directly to Delta Plains.

<u>The Frost Guarantee</u>

54.     On or about June 26, 2020, Frost paid $75,000 as an additional investment to Delta Plains. In conjunction with this additional investment, Brown signed a Notice of Personal Guarantee (the "Frost Guarantee"), on Delta Plains letterhead, referencing Frost as an EFI investor, promising personal liability on the following repayment schedule to Frost, with 10% interest on the added funds:

August 31, 2020: $82,500.00

November 15, 2020: $32,083.00

February 15, 2021: $32,083.00

May 15, 2021: $32,083.00

August 15, 2021: $128,332.00

November 15, 2021: $128,348.00

55.     The revised payment schedule in the Frost Guarantee incorporated within Brown's personal guarantee the original repayment obligations from the Frost Subscription Agreement.

56.     Also in the Frost Guarantee, Brown promised to provide to Frost "$100,000.00 worth of ownership interest in a saltwater disposal well as has previously been discussed between the parties, or equivalent ownership in a property/well mutually agreed upon by the parties [sic]". Upon information and belief, no such "saltwater disposal well" exists.

57.     Frost never received any payments under the Frost Guarantee, and never received any interest in a "saltwater disposal well."

58.     Upon information and belief, Brown never intended to make any payments under the Frost Guarantee, or convey to Frost any interest in a "saltwater disposal well."

59.     Upon information and belief, Brown did not own or control any interest in a "saltwater disposal well."

60.     In or prior June of 2020, to induce the additional investment from Frost, Brown, directly or through an agent, provided two undated checks to Frost in the amount of $41,230 and $41,250, drawn on a Delta Plains bank account.  Frost spoke directly with Brown about depositing these checks and Brown told him that that account the checks were written on did not have sufficient funds to honor the checks but that sufficient funds would be available shortly, and that Brown would call Frost to let him know when Frost could date and deposit the checks.

61.     Brown never called or otherwise informed Frost that sufficient funds were available to deposit the two undated checks he/Delta Plains sent Frost.

<u>The Ford Guarantee</u>

62.     On or about August 14, 2020, Ford paid $75,000 as an additional investment to Delta Plains.  In conjunction with this additional investment, Brown signed a Notice of Personal Guarantee (the "Ford Guarantee"), referencing Ford as an EFI investor, promising personal liability on the following repayment schedule to Ford, with 12% interest on the added funds:

Within 60 days of additional investment: $84,000.00

December 6, 2020: $60,958.00

March 5, 2021: $60,958.00

June 11, 2021: $60,958.00

September 11, 2021: $121,916.00

December 3, 2021: $182,874.00

March 4, 2022: $243,848.00

63.     The revised payment schedule in the Ford Guarantee incorporated within Brown's personal guarantee the original repayment obligations from the Ford Subscription Agreement.

64.     Also in the Ford Guarantee, Brown promised to provide to Ford "a Credited Position of an undivided 0.50% Working Interest (WI) in the Geomark Birge Lease (as specified

in Exhibit A), representing a 0.375% Net Revenue Interest (NRI)."  Upon information and belief, no such "Geomark Birge Lease" exists.

65.     Ford and Frost relied on Brown's representations that he would fulfill his obligations under their respective personal guarantees. For example, Ford texted Brown on October 16, 2020: "Will you let me know how you will get the $84,000 [first payment on the guarantee] to me on Monday? Do you need wiring instructions or are you sending a check via FedEx like you did the first time?"

66.     Ford never received any payments under the Ford Guarantee, and never received any interest in a "Geomark Birge Lease."

67.     Upon information and belief, Brown never intended to make any payments under the Ford Guarantee, or convey to Ford any interest in a Geomark Birge Lease.

68.     Upon information and belief, Brown did not own or control any interest in a "Geomark Birge Lease."

69.     To induce the additional investment from Ford, Brown, directly or through an agent, provided two undated checks from "Delta Plains Services, LLC" to Ford, each in the amount of $41,250, drawn on a purported Delta Plains bank account.  Brown represented to Ford that the account these checks were written on did not have sufficient funds to honor the checks but that sufficient funds would be available shortly, and that Brown would call Ford to let him know when Ford could date and deposit the checks.

70.     Brown never called or otherwise informed Frost that sufficient funds were available to deposit the two undated checks Delta Plains/Brown sent Frost.

71.     Ford presented the checks for payment on July 25, 2022, at Wells Fargo Bank, the same bank on which the checks were drawn, but the bank informed Ford that these checks could

not be honored because Delta Plains' account did not have sufficient funds, and because the checks were not dated.

72.     Yohanan and the Delta Defendants provided various service agreements, purporting to show that Brown and Delta Plains had profitable business dealings with legitimate companies, business from which Defendants could repay Plaintiffs.  For example, Yohanan provided a purported "Master Service Agreement" between Endeavor Energy Resources, L.P., and Delta Plains, for provision of equipment and labor for oil and gas wells.  Brown also provided purported checks from Endeavor Energy to Delta Plains, to verify service income to Delta Plains.

73.     Similarly, Brown provided a purported "Master Services Agreement" between WPX Energy Permian, LLC and another company purportedly owned by Brown.

74.     Upon information and belief, these service agreements and payment evidence were fake.

75.     On March 16, 2021, Yohanan sent an email to Ford and Frost, representing, *inter alia*: "Justin [Brown] has expanded his business into North Dakota (in a rather clever fashion, on the 'cheap', trading some consulting work assisting an oil business up there for access to their frac sand and to their oil service contracts).  This has greatly expanded his revenue sources."  Upon information and belief, these representations were false.

76.     One or more of the Delta Plaints Defendants and Yohanan/EFI continuously and falsely assured Plaintiffs that payments were coming soon.

77.     For example, On August 29, 2020, Brown texted Ford, stating:

"Things are moving in a very positive direction. We are currently on Two WPX Energy Wells. They will be giving us between 3 to 13 more…WPX Energy truly is the best/most active account today in the Permian Basin till Exxon Mobil & Concho Resources kick off in the next 60 days or so…"

78.     On November 20, 2020, Brown represented to Ford as an EFI investor that it was Yohanan's responsibility to advise EFI's investors of the information communicated by one or more of the Delta Plains Defendants to the EFI investors.

79.     On March 16, 2021, Yohanan emailed Ford and Frost (who forwarded the communication to Draper) the "EFI/Delta Plains Year End Report to Investors/Members." This email and report falsely represented that "the projected cash flows over the course of the entire year indicate all payments will be met."

80.     On August 13, 2021, Ford and Brown texted as follows:

**Ford**: Hey Justin [Brown].  We are starting the process of pulling money out of our house.  Any chance we could see some money from you soon?

**Brown**: Absolutely.  We are 3 to 4 weeks away.  Then we will able start *[sic]* regular payments.

Let's definitely catch up to discuss this Tuesday or Wednesday?  Appreciate you Russ [Ford].

81.     No payment followed within "3 to 4 weeks," or any time thereafter.

82.     Later, on March 17, 2022, Ford and Brown texted as follows:

Ford: When can I expect the check you promised last week?

Brown: Finishing up a project in the next 3 to 5 days, then we get paid immediately.

Sorry I've been in Houston trying to expedite getting everything done.

Appreciate it Russ and will get back with you Monday.  Thank you sir

83.     No payment followed within "3 to 5 days," or any time thereafter.

84.     Later, on April 19, 2022, in response to a follow up from Ford, Brown promised: "We are getting ready to send send [sic] payment and followed up by consistent payments.  I will get with you this week as I wrap up a project.  Thank you."

85.     No payment followed this assurance from Brown.

86.     On May 11, 2022, in response to a contemplated legal action, Brown promised: "We can avoid and get everything on the right path, relax, we will be golden.  I'll call you in the morning."

87.     That same day, Ford responded, *inter alia*: "We need to see payment, not more promises.  You have promised every month it seems for that last three years *[sic]*."

88.     Brown replied: "Russ, I understand completely.  We will be golden.  Seriously, relax."

89.     No payment followed this assurance from Brown.

90.     Following serial failures by one or more of the Delta Defendants and/or EFI to meet original or revised payment obligations, the Plaintiffs conferred with Brown on a plan to visit drilling operations in Hobbs, New Mexico, to verify and observe oil production and related servicing operations. Air travel arrangements were agreed upon for Plaintiffs to travel to Hobbs for a site visit on February 4-5, 2022.

91.     Brown cancelled that site visit with little notice.

92.     Plaintiff then rescheduled the Hobbs, New Mexico site visit for March 3, 2022.

93.     Brown cancelled the second site visit as well, one day before it was to take place.

**The Delta Defendants' Intent to Defraud and Plaintiffs' Reliance**

94.     At the time they were made, the Delta Defendants knew their representations regarding the performance and condition of Delta Plains, and the repayments and expected income to Plaintiffs were false because the Delta Defendants never intended or expected to pay income related to any service or lease agreements, or repay the investment payments.

95.     Instead, the Delta Defendants intended and expected to perpetrate a fraudulent scheme and misappropriate the $1,075,000 paid by Plaintiffs.

96.    Any statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the false statements described herein.  The statements were not described as "forward-looking statements" when made.  To the extend there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in purportedly forward-looking statements.

97.    Alternatively, to the extent a safe harbor does apply to any forward-looking statements, the Delta Defendants are liable for those false forward-looking statements because at the time the Delta Defendants made each of those forward-looking statements, the Delta Defendants knew the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by Brown, an executive officer of Delta Plains, who knew the statement was false when made or who concealed material facts regarding the falsity of the forward-looking statement.

**The Delta Defendants' Pattern and Practice of Defrauding Investors**

98.    Upon information and belief, Brown and Horton have used Delta Plains or other entities they control to perpetuate their scheme to defraud investors through false promises of delivering working interests in oil wells and leases, providing income from the working interests, and repaying principal payments with interest in a short period.

99.    Plaintiffs have identified numerous other lawsuits alleging similar fraudulent conduct.

Numerous defrauded investors from numerous states, each with inadequate sophistication to properly vet the complex legal agreements used by the Delta Defendants and EFI to perpetuate their fraud, have been directly affected by Defendants' fraudulent investment scams, and Defendants' fraud has significant potential to defraud others in the future.

**COUNT I**

**Violations of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5**
**(15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5)**
**(The EFI Units: Draper, the Trust, and Ford Against the Delta Defendants)**

100.    Plaintiffs incorporate by reference herein all prior paragraphs of this Complaint.

101.    The EFI Units issued constituted a "security" within the meaning of the Securities and Exchange Act of 1934 (the "1934 Act"), as the EFI Units represent a note, a certificate of interest or participation in a profit-sharing agreement, and an investment contract. *See* 15 U.S.C. § 78c(10).

102.    As set forth above, Brown, Horton, Bennett, and Delta Plains violated § 10(b) of the 1934 Act and Rule 10b-5 thereunder in that, in connection with the sale of a security, they:

a.    Employed devices, schemes, and artifices to defraud;

b.    Made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.    Engaged in acts, practices, and a course of business that operated as a fraud upon Draper, the Trust, and Ford in connection with the Subscription Agreements.

103.    As set forth above, the Delta Defendants participated in the fraudulent scheme by knowingly making and/or disseminating material misstatements and/or engaging or causing entities they control to engage in and further the fraudulent scheme.

104.    As set forth above, the Delta Defendants' acts, misrepresentations, and omissions were intended to, and did, deceive, manipulate, and/or defraud Draper, the Trust, and Ford.

105.    But for the Delta Defendants' misrepresentation and omissions of material facts and fraudulent scheme outlined above, Draper, the Trust and Ford would not have purchased the EFI Units.

17

106.   As a result of the Delta Defendants' violations of § 10(b) of the 1934 Act and Rule 10b-5, Draper, the Trust, and Ford have suffered damages in that they, *inter alia*, have not received repayment of the $925,000 payments they made for the EFI Units, and the security has substantially less value, if any, than what the Delta Defendants represented.

WHEREFORE, Plaintiffs pray for judgment against Defendants Brown, Horton, Bennett, and Delta Plains, jointly and severally, as follows:

A.   Awarding Draper, the Trust, and Ford actual damages in an amount to be proven at trial;

B.   Awarding Draper, the Trust, and Ford pre- and post-judgment interest as permitted by law;

C.   Awarding Draper, the Trust, and Ford reasonable costs and attorney fees; and

D.   Awarding such other relief as the Court may deem just and proper.

## COUNT II
**Violations of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5**
**(15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5)**
**(The Frost Guarantee: Frost Against Brown)**

107.   Plaintiffs incorporate by reference herein all prior paragraphs of this Complaint.

108.   The Frost Guarantee issued by Brown to Frost constituted a "security" within the meaning of the Securities and Exchange Act of 1934 (the "1934 Act"), as the Frost Guarantee represents a note, a certificate of interest or participation in a profit-sharing agreement, and an investment contract. *See* 15 U.S.C. § 78c(10).

109.   As set forth above, Brown violated § 10(b) of the 1934 Act and Rule 10b-5 thereunder in that, in connection with the sale of a security, he:

a.   Employed devices, schemes, and artifices to defraud;

18

b. Made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c. Engaged in acts, practices, and a course of business that operated as a fraud upon Frost.

110. As set forth above, Brown participated in the fraudulent scheme by knowingly making and/or disseminating material misstatements and/or engaging or causing entities they control to engage in and further the fraudulent scheme.

111. As set forth above, Brown's acts, misrepresentations, and omissions were intended to, and did, deceive, manipulate, and/or defraud Frost.

112. But for Brown's misrepresentation and omissions of material facts and fraudulent scheme outlined above, Frost would not have purchased the Frost Guarantee.

113. As a result of Brown's violations of § 10(b) of the 1934 Act and Rule 10b-5, Frost has suffered damages in that he, *inter alia*, has not received repayment of the $75,000 payment he made for the Frost Guarantee, or promised interest, or promised penalties, or the promised $100,000 interest in a saltwater disposal well, and the security has substantially less value, if any, than what Brown represented.

WHEREFORE, Plaintiff Frost prays for judgment against Defendant Justin Brown as follows:

A. Awarding Plaintiff Frost actual damages in an amount to be proven at trial;

B. Awarding Plaintiff Frost pre- and post-judgment interest as permitted by law;

C. Awarding Plaintiff Frost reasonable costs and attorney fees; and

D. Awarding such other relief as the Court may deem just and proper.

## COUNT III

### Violations of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5
### (15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5)
### (The Ford Guarantee: Ford Against Brown)

114.   Plaintiffs incorporate by reference herein all prior paragraphs of this Complaint.

115.   The Ford Guarantee issued by Brown to Ford constituted a "security" within the meaning of the Securities and Exchange Act of 1934 (the "1934 Act"), as the Ford Guarantee represents a note, a certificate of interest or participation in a profit-sharing agreement, and an investment contract.  *See* 15 U.S.C. § 78c(10).

116.   As set forth above, Brown violated § 10(b) of the 1934 Act and Rule 10b-5 thereunder in that, in connection with the sale of a security, he:

   a.   Employed devices, schemes, and artifices to defraud;

   b.   Made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   c.   Engaged in acts, practices, and a course of business that operated as a fraud upon Ford.

117.   As set forth above, Brown participated in the fraudulent scheme by knowingly making and/or disseminating material misstatements and/or engaging or causing entities they control to engage in and further the fraudulent scheme.

118.   As set forth above, Brown's acts, misrepresentations, and omissions were intended to, and did, deceive, manipulate, and/or defraud Ford.

119.   But for Brown's misrepresentation and omissions of material facts and fraudulent scheme outlined above, Ford would not have purchased the Ford Guarantee.

120.    As a result of Brown's violations of § 10(b) of the 1934 Act and Rule 10b-5, Ford has suffered damages in that he, *inter alia*, has not received repayment of the $75,000 payment he made for the Ford Guarantee, or interest, or a .50% Working Interest in the Geomark Birge Lease referenced in the Ford Guarantee, and the security has substantially less value, if any, than what Brown represented.

WHEREFORE, Plaintiff Frost prays for judgment against Defendant Justin Brown as follows:

A.  Awarding Plaintiff Ford actual damages in an amount to be proven at trial;

B.  Awarding Plaintiff Ford pre- and post-judgment interest as permitted by law;

C.  Awarding Plaintiff Ford reasonable costs and attorney fees; and

D.  Awarding such other relief as the Court may deem just and proper.

## COUNT IV
### Violations of The Colorado Securities Act
**(The Frost Guarantee and Ford Guarantee: Frost and Ford Against Brown and Delta Plains)**

121.    Plaintiffs incorporate by reference herein all prior paragraphs of this Complaint.

122.    As described above, in connection with the offer and sale of a security, directly or indirectly, Brown and Delta Plains made untrue statements of a material fact, and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in an act, practice, or course of business which would operate as a fraud or deceit upon Plaintiffs.

123.    Brown's and Delta Plains' actions in making the above misstatements and omissions in connection with the Frost Guarantee and the Ford Guarantee constitute violations of C.R.S. § 11-51-501(1)(b).

124.    Plaintiffs Frost and Ford were unaware at the time they purchased the Frost Guarantee and the Ford Guarantee of the above misrepresentations and omissions.

125.    Brown and Delta Plains are liable to Frost and Ford for the consideration paid for the investments, plus interest, costs, and reasonable attorney fees pursuant to C.R.S. § 11-51-604(4).

WHEREFORE, Plaintiffs Frost and Ford pray for judgment against Defendants Justin Brown and Delta Plains, jointly and severally, as follows:

A. Awarding Plaintiffs Frost and Ford actual damages in an amount to be proven at trial, including the consideration paid for the investments;

B. Awarding Plaintiffs Frost and Ford pre- and post-judgment interest as permitted by law;

C. Awarding Plaintiffs Frost and Ford reasonable costs and attorney fees; and

D. Awarding such other relief as the Court may deem just and proper.

### COUNT V
**Control Person Liability under the Securities Act and the Colorado Securities Act**
**(Ford and Frost Against Brown, Horton, and Bennett)**

126.    Plaintiffs incorporate by reference herein all prior paragraphs of this Complaint.

127.    Defendants Brown, Horton and Bennett directly or indirectly controlled Defendant Delta Plains.

128.    Defendants Brown, Horton and Bennett are liable to Plaintiffs for violations of the Colorado Securities Act as alleged in Count IV of this Complaint.

129.    Defendants Brown, Horton and Bennett are further liable to Plaintiffs for the consideration paid for the investments, interest, costs and reasonably attorneys' fees pursuant to Colo. Rev. Stat. §§ 11-51-604(5)(a) and (b).

22

WHEREFORE, Plaintiffs Ford and Frost pray for relief against Defendants Brown, Horton, and Bennett, jointly and severally, as follows:

    A.   Awarding Ford and Frost their damages as allowed by law;

    B.   Awarding Ford and Frost their attorney fees and costs and expert witness fees;

    C.   Awarding Ford and Frost their exemplary damages, treble damages, and penalties as provided by statute.

    D.   Awarding Ford and Frost pre-judgment and post-judgment interest.

## COUNT VI
### Breach of Contract
### (The Subscription Agreements: Draper, the Trust, and Ford Against EFI)

130.    Plaintiffs incorporate by reference herein all prior paragraphs of this Complaint.

131.    Plaintiffs Draper, the Trust, and Ford each entered into a Subscription Agreement with EFI, which were valid contracts.

132.    As described above, Plaintiffs Draper, the Trust, and Ford each performed their required duties under the Subscription Agreements by paying $200,000, $250,000, and $475,000, respectively, in exchange for EFI Units.

133.    EFI failed to substantially perform its obligations under the Subscriptions Agreements, by failing to make the payments described in the payback schedules of each Subscription Agreement, as described above.

134.    EFI's breaches of the Subscription Agreements have caused Plaintiffs Draper, the Trust, and Ford to suffer damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs Draper, the Trust, and Ford pray for judgment against Defendant EFI as follows:

    A.   Awarding Plaintiffs Draper, the Trust, and Ford actual damages in an amount to be proven at trial;

    B.   Awarding Plaintiffs Draper, the Trust, and Ford pre- and post-judgment interest as permitted by law;

    C.   Awarding such other relief as the Court may deem just and proper.

**COUNT VII**
**Breach of Contract**
**(The Frost Guarantee and the Ford Guarantee: Frost and Ford Against Brown)**

135.    Plaintiffs incorporate by reference herein all prior paragraphs of this Complaint.

136.    Plaintiffs Frost and Ford each entered into a Notice of Personal Guarantee with Brown, which were valid contracts.

137.    As described above, Plaintiffs Frost and Ford each performed their required duties under the Notices of Personal Guarantee by each paying $75,000 to Brown's company, Delta Plains.

138.    As described above, Brown failed to substantially perform his obligations under the Notices of Personal Guarantee, by failing to make the required payments described in the Notices of Personal Guarantee.

139.    Brown's breaches of the Notices of Personal Guarantee have caused Plaintiffs Frost and Ford to suffer damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs Frost and Ford pray for judgment against Defendant Brown as follows:

    A.   Awarding Plaintiffs Frost and Ford actual damages in an amount to be proven at trial;

    B.   Awarding Plaintiffs Frost and Ford pre- and post-judgment interest as permitted by contract and law;

    C.   Awarding such other relief as the Court may deem just and proper.

24

<u>COUNT VIII</u>
**Fraud**
**(All Plaintiffs Against the Delta Defendants)**

140.    Plaintiffs incorporate by reference herein all prior paragraphs of this Complaint.

141.    As described above, the Delta Defendants misrepresented material facts relating to the profitability, performance, and business condition of Delta Plains and the Delta Defendants.

142.    Plaintiffs justifiably relied on such misrepresentations.

143.    Plaintiffs' reliance on the Delta Defendants' misrepresentations caused Plaintiffs to suffer damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for judgment against Defendants Brown, Bennett, Horton, and Delta Plains, jointly and severally, as follows:

A.  Awarding Plaintiffs actual damages in an amount to be proven at trial;

B.  Awarding Plaintiffs pre- and post-judgment interest as permitted by contract and law;

C.  Awarding Plaintiffs exemplary damages, as allowed by law; and

D.  Awarding such other relief as the Court may deem just and proper.

<u>COUNT IX</u>
**Civil Theft**
**(The Frost Guarantee and the Ford Guarantee: Ford and Frost Against Brown and Delta Plains)**

144.    Plaintiffs incorporate by reference herein all prior paragraphs of this Complaint.

145.    As described above, by deception, Brown and Delta Plains knowingly obtained, retained, and exercised control over valuable money belonging to Plaintiffs Frost and Ford.

146.    Brown and Delta Plains intended to permanently deprive Frost and Ford of the $75,000 payments Frost and Ford each paid to Brown and/or Delta Plains as part of the Frost Guarantee and the Ford Guarantee.

147.    Brown and Delta Plains are liable to Frost and Ford for civil theft, as described in C.R.S. § 18-4-401.

148.    Plaintiffs Frost and Ford have suffered damages from the civil theft herein described, and are entitled to "three times the amount of the actual damages sustained," as well as "costs of the action and reasonable attorney fees," pursuant to C.R.S. § 18-4-405.

WHEREFORE, Plaintiffs Frost and Ford pray for judgment against Defendants Brown and Delta Plains, jointly and severally, as follows:

A.  Awarding Frost and Ford actual damages in an amount to be proven at trial;

B.  Awarding Frost and Ford pre- and post-judgment interest as permitted by contract and law;

C.  Awarding Frost and Ford treble damages, as allowed by law;

D.  Awarding Frost and Ford costs and reasonable attorney fees; and

E.  Awarding such other relief as the Court may deem just and proper.

## COUNT X
### Unjust Enrichment, *in the alternative*
### (Ford and Frost Against Brown and Delta Plains)

149.    Plaintiffs incorporate by reference herein all prior paragraphs of this Complaint.

150.    As described above, Brown and Delta Plains received a benefit in the form of the $75,000 payments Frost and Ford each paid to Brown and Delta Plains as part of the Frost Guarantee and the Ford Guarantee.

151.    Under the circumstances described herein, it would be unjust for Brown or Delta Plains to retain the benefit of the two $75,000 payments without commensurate compensation to Plaintiffs Frost and Ford.

WHEREFORE, Plaintiffs Frost and Ford pray for judgment against Defendant Brown as follows:

    A.   Awarding Ford and Frost actual damages in an amount to be proven at trial;

    B.   Awarding Ford and Frost pre- and post-judgment interest as permitted by contract and law; and

    C.   Awarding such other relief as the Court may deem just and proper.

### COUNT XI
**Negligent Misrepresentation**
**(Draper, the Trust, and Ford Against Yohannan/EFI)**

152.    Plaintiffs incorporate by reference herein all prior paragraphs of this Complaint.

153.    As described above, in the course of his business, profession, or employment, Yohanan and/or EFI made a misrepresentations of material fact to Draper, the Trust, and Ford, without reasonable care, including the representations, *inter alia*, that: (1) Brown was a trustworthy investment partner; (2) the money invested in Delta Plains "went to purchase equipment;" and (3) that the "executive summary" from Horton and Delta Plains was "a good outline of what they have done and where they are at, and where they are headed."

154.    Such representations by Yohanan were for the guidance of Draper, the Trust, and Ford in their business transactions, and Yohanan/EFI knew that his representations would be relied upon by Plaintiffs.

155.    Plaintiffs justifiably relied on Yohanan's/EFI's representations to their detriment.

WHEREFORE, Plaintiffs Draper, Frost and Ford pray for judgment against Defendants Yohanan and EFI as follows:

    A.   Awarding Draper, the Trust and Ford actual damages in an amount to be proven at trial;

B.  Awarding Draper, the Trust and Ford pre- and post-judgment interest as permitted by

contract and law; and

C.  Awarding such other relief as the Court may deem just and proper.

## COUNT XII
### Civil Conspiracy
### (All Plaintiffs Against the All Defendants)

156.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

157.    Brown, Horton, Bennett, Delta Plains, Yohannan and EFI concealed from, and/or

failed to disclose to Plaintiffs material facts including, without limitation, that Delta Plains did not

have oil production servicing equipment or business revenue sufficient to reasonably assure

Plaintiffs that repayments as promised would be timely forthcoming, or forthcoming at all.

158.    Obtaining money from Plaintiffs by means of the foregoing misrepresentations,

concealment, and negligent/reckless fundraising practices was an unlawful goal.

159.    The Delta Defendants each collaborated in multiple acts in order to accomplish

their unlawful goals, and, in addition, Brown/Delta Plains collaborated in multiple acts with

EFI/Yohannan in order to accomplish their unlawful goals.

160.    As a direct and proximate result of the Defendants' civil conspiracy, Plaintiffs

suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment against the Defendants, jointly and

severally, as follows:

A.  Awarding Plaintiffs actual damages in an amount to be proven at trial;

B.  Awarding Plaintiffs pre- and post-judgment interest as permitted by contract and law;

and

C.  Awarding such other relief as the Court may deem just and proper.

## COUNT XIII
### Violations of the Colorado Consumer Protection Act
### (All Plaintiffs Against the Delta Defendants)

161.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

162.   As detailed above, upon information and belief, in the course of their business, Brown, Horton, Bennett, and Delta Plains knowingly made a false representation as to affiliation, connection, and association with outside energy companies, including but not limited to Endeavor Energy Resources, L.P., and WPX Energy Permian, LLC, in contravention of C.R.S. § 6-1-105(1)(c).

163.   As detailed above, in the course of their business, Brown, Horton, Bennett, and Delta Plains made false representations as to the characteristics, uses, and benefits of the investments in Delta Plains, in contravention of C.R.S. § 6-1-105(1)(e).

164.   As detailed above, in the course of their business, Brown, Horton, Bennett, and Delta Plains made false representations as to the quality of the investments in Delta Plains, in contravention of C.R.S. § 6-1-105(1)(g).

165.   As detailed above, in the course of their business, Brown, Horton, Bennett, and Delta Plains failed to disclose material information concerning the investments in Delta Plains, which the Delta Defendants knew at the time of sale, and which was intended to induce Plaintiffs to enter into a transaction, in contravention of C.R.S. § 6-1-105(1)(u).

166.   By means of the above-described unlawful deceptive trade practices, the Delta Defendants have deceived, misled, and unlawfully acquired money from actual and potential consumers.

167.   The Delta Defendants' actions, by clear and convincing evidence, constitute bad faith conduct as described in C.R.S. § 6-1-113(2)(a)(III) and in C.R.S. § 6-1-113(2.3).

WHEREFORE, Plaintiffs pray for judgment against the Delta Defendants, jointly and severally, as follows:

A.  Awarding Plaintiffs actual damages in an amount to be proven at trial;

B.  Awarding Plaintiffs pre- and post-judgment interest as permitted by law;

C.  Awarding Plaintiffs treble damages, as allowed by law;

D.  Awarding Plaintiffs costs and reasonable attorney fees; and

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues stated herein, and all issues so triable.

Respectfully submitted this 10th day of August, 2022.

/s/ *David G. McConkie*
*Original Signature on File per Rules*
David G. McConkie, #39864
Bradford S. Monson, #43128
2 N. Cascade Ave., Suite 320
Colorado Springs, CO  80903
Phone: (719) 475-9300
Fax: (719) 475-9311
E-Mail: mcconkie@torbetlaw.com